**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

WALTER E. BUSBY, JR.                    )
                                        )
                    Plaintiff,          )
                                        )        Case No. 11-CV-447-JED-PJC
v.                                      )
                                        )
CITY OF TULSA; CHARLES W. JORDAN;       )
WALTER EVANS;                           )
                                        )
                    Defendants.         )

## OPINION AND ORDER

The Court has for its consideration the Motion for Summary Judgment (Doc. 48), filed by

the defendants.  Defendants also filed Errata / Corrections (Doc. 49, 51).  Plaintiff filed a

Response (Doc. 57), and defendants filed a Reply (Doc. 65), as well as two supplemental briefs

(Doc. 70, 97), to which plaintiff responded (Doc. 77, 100).

## I.      Background

The following summary is based upon the evidence, drawn in favor of the plaintiff, as it

must be at the summary judgment stage.  Plaintiff, Walter E. Busby, Jr., is an African American

man who has been employed by the Tulsa Police Department (TPD) since 1981.  In April 2008,

plaintiff, then a Captain in the TPD, was transferred to the Mingo Valley Division of the TPD.

Major Walter Evans was the Mingo Valley Division Commander.  Major Evans assigned

plaintiff to be Second Shift Commander at Mingo Valley.  As Division Commander of Mingo

Valley, Evans was responsible for directing all law enforcement activities within the geographic

boundaries of East Tulsa.

There is evidence supporting plaintiff's claim that, in January, 2010, Major Evans, who is

also African American, ordered plaintiff to march in the Martin Luther King, Jr. Day Parade

(MLK Parade).[1] During a conversation on January 13 of that year, plaintiff informed Evans that plaintiff did not want to participate in the MLK Parade because plaintiff believed the TPD was attempting to use plaintiff's appearance in the MLK Parade as a sign that plaintiff endorsed the TPD as racially unbiased and fair. Evans understood that plaintiff did not want to participate in the parade because he did not want to "put a façade in front of the African American community" that suggested the TPD was free of racial division and issues.

Although other captains participated in the MLK Parade, plaintiff provided evidence that he was the only captain that was *ordered* to participate. Two captains volunteered to march in the parade. The City admits that one of the four captains under Major Evans's command was not ordered to march in the parade and was granted holiday leave, although the City asserts that she was not similarly situated to plaintiff because she was an "administrative" captain.

During the January 13 conversation, plaintiff asked Evans if plaintiff could take a few hours of holiday leave during the MLK Parade so that he would not be required to march in the event as a TPD representative. Evans told him to submit a leave request. Plaintiff then submitted a holiday leave slip, requesting leave during the MLK Parade. Evans denied the request and wrote a memo to plaintiff stating:

> After careful consideration, I have decided to deny your request. You will report to work as [sic] on January 18, 2010, as scheduled and one of your assignments for that day will be to participate as a representative of the [Mingo Valley Division] staff at the MLK parade.

(Doc. 57-15). Plaintiff asserts that there is no historical record that any other captain's request for holiday leave had ever been denied, and there is no evidence of any other captain being

---

[1] Although defendants repeatedly emphasize that Major Evans is the same race as plaintiff, that fact does not invalidate plaintiff's claim of racial discrimination. *See Oncale v. Sundown Offshore Servs., Inc.* 523 U.S. 75, 78 (1998) ("in the ... context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race.").

ordered to march in any parade.  As noted, one of the four captains under Evans's command was granted leave during the MLK Parade.  She is white.

Plaintiff responded to Evans's memo the same day.  Among other things, plaintiff's response stated that the order to participate in the MLK Parade was "illegal" and "unfair" because plaintiff was being ordered to participate because of his race and he was unaware of any other captain who had been ordered to participate.  Plaintiff also requested that Evans reconsider the order to participate and the request for holiday leave.  In reply, Evans denied that his "stated reason" for requiring plaintiff to participate "was due to [plaintiff's] race," but admitted that he had reported his embarrassment "that few African American officers participate in [TPD] ceremonies, such as ... the MLK Parade..." and acknowledged that "[t]he fact that we both share the same race as Dr. King and that the parade is held in the African American community is consequential."  (Doc. 57-9).  Evans also stated that he "cannot confirm nor deny that no other captain has been directed to attend the parade...."  (*Id.*).

Under protest, plaintiff ultimately complied with the directive and participated in the MLK Parade on January 18, 2010.  Notwithstanding his participation, plaintiff presented evidence from which it could be inferred that, just days after the parade, Evans began to retaliate against plaintiff for plaintiff's opposition to Evans's directive.  (*See* Doc. 57 at 19, ¶¶ 44-47). Plaintiff alleges that, based on his voicing opposition and complaining about being ordered to march in the MLK Parade on the basis of his race, he was subjected to increasing hostility and retaliation, and his next performance evaluation was the worst he had ever received in his almost 30 years at the TPD.

On March 30, 2010, plaintiff wrote to the TPD Chief Jordan and indicated that he was being subjected to increasing hostility following the MLK Parade.  Thereafter, Evans moved

plaintiff from the day shift (Second Shift) to the Fourth Shift (4:00 p.m. to 2:00 a.m.), which would permit plaintiff little time with his wife and young daughters. According to plaintiff, he was thus forced to use substantial amounts of his accrued vacation time, which he had spent years accumulating. Following the transfer to the Fourth Shift, plaintiff filed a formal discrimination complaint with the TPD on June 18, 2010.

The TPD contends that the actions were not taken in retaliation for plaintiff's opposition to being denied holiday leave and ordered to march in the MLK Parade. However, plaintiff's complaints and opposition to being directed to march in the MLK Parade were prominently identified in the most negative ratings in plaintiff's 2010 evaluation. For example, plaintiff was rated as "Needs Improvement" under "Conformance with rules, policies and instructions," and "Relationships with Others," based in part on the following, written by Evans:

> In January of 2010, I assigned Captain Busby to march in the police procession during the Martin Luther King Parade. Captain Busby objected to marching in the procession because (as he stated) he did not want to "stand with them". He so much objected to attending, that I was forced to "order" him to march. He reported to the parade, as directed, but he alienated himself from others by separating himself from others during the assembly, and by marching about 20 feet behind the police procession. This was noticed by other staff in attendance....

In addition, he was rated as "Inadequate" as a supervisor, based in part on the MLK Parade:

> In January of 2010 Captain Busby objected to participating in the Martin Luther King Parade because "he did not want to 'put on a façade of unity' or 'march with them' (referring to officers who opposed the [Black Officers Coalition] lawsuit). When I refused to excuse him from the assignment, he crafted a memorandum that accused me of racism, and implied that legal action would follow if I did not reconsider.

(Doc. 57-19 at 6-8; *see also* Doc. 57-20 [plaintiff's memo to TPD Chief alleging retaliation]).[2]

---

[2]    The 2010 Performance Evaluation was very positive in certain areas and reflected that plaintiff's work served numerous important functions. For example, Evans reported that, "[b]ecause of [plaintiff's] attention to scheduled large-scale sporting events, the level of gang violence and aggravated assaults in Mingo Valley was almost non-existent, compared to other

Plaintiff appealed the negative performance evaluation, but his appeal was rejected, and the negative evaluation thus became part of his permanent file at the TPD. Thereafter, plaintiff sought, unsuccessfully, a promotion to Major, which required the submission of his three most recent evaluations, including the 2010 evaluation.

Based upon the foregoing, plaintiff asserts Title VII claims for disparate treatment discrimination based on race and for retaliation for his complaints of racial discrimination to the TPD human resources, the Civil Service Commission, the TPD Chief, the Mayor, and Major Evans. (Doc. 7, First Cause of Action). Plaintiff also asserts claims under the First Amendment, alleging that the defendants "ordered and forced [him] under penalty of adverse employment consequences to ... conform with an ideology contrary to Plaintiff's expressed political beliefs in direct violation of Plaintiff's right to freedom of speech and expression..." and then retaliated against him for stating his objections to participating in the MLK Parade. (*See id.*, Second and Third Causes of Action). Plaintiff alleges that he was denied Equal Protection under the Fourteenth Amendment, because the defendants treated similarly situated employees outside of the protected class differently than plaintiff. Defendants seek summary judgment on all of plaintiff's claims.

---

areas of the city"; plaintiff "kept his overtime expenditures to extremely low levels, saving the City thousands of dollars during tough economic times"; "Busby is very adept at managing critical incidents and major crime scenes," including appropriately acting to locate a missing seven year old boy, and taking command of a large fight that erupted and quickly restoring order; and that plaintiff was a "key player in planning for a severe ice storm," and "in reducing gang violence in North Tulsa after a reputed gang member was murdered," which avoided "the usual retaliation shootings." (Doc. 57-19 at 2-6, 10). The focus of Evans's negative comments included plaintiff's "conflict with at least one subordinate supervisor, and also with his commanding officers," during which plaintiff allegedly acted inappropriately. (*Id.* at 4). Later in the report, the MLK Parade issue is cited as a key example in support of that "conflict" and "inappropriate" action. (*See id.* at 6-8).

## II. Summary Judgment Standards

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

These same summary judgment standards apply to employment claims. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). Thus, the Court must view all facts in the light most favorable to the plaintiff as the non-moving party and will "draw all reasonable inferences" in his favor. *Id.*; *Anderson*, 477 U.S. at 255. "'[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "When evaluating an employer's motives or reasons, 'motivation is itself a factual question.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).

### III.    Discussion

#### A.    Title VII Claims

##### 1.    Race Discrimination

The City of Tulsa argues that plaintiff cannot establish racial discrimination under Title VII of the Civil Rights Act. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff proves a Title VII violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 ... (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Under the burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination, which requires that the plaintiff demonstrate that he (1) is a member of a protected class, (2) suffered an adverse employment action, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). The plaintiff's burden at the prima facie stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation, by a preponderance of the evidence, and the burden is "not onerous." *Smothers*, 740 F.3d at 539 (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005); *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191, 1197 (10th Cir. 2000)).

If the plaintiff meets the prima facie burden, then the defendant must offer a legitimate, non-discriminatory reason for the employment action, which is a burden of production, not one of persuasion. *Smothers*, 740 F.3d at 539 (citing *Horizon/CMS Healthcare*, 220 F.3d at 1191). Assuming the employer meets that burden, then the plaintiff may defeat summary judgment only

by showing that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). Thus, if "a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' a jury may 'infer the ultimate fact of discrimination' or retaliation." *Smothers*, 740 F.3d at 546 (quoting *Swackhammer v. Spring/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)). However, "[m]ere conjecture that the employer's reason is pretext . . . will not defeat a motion for summary judgment." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

In the section of its brief regarding plaintiff's Title VII race discrimination claim, the City focuses on plaintiff's alleged inability to show pretext, and does not directly argue that plaintiff has failed in his minimal burden to establish a prima facie case. With respect to a prima facie case, there is no dispute that, as an African American, plaintiff is a member of a protected class. (Doc. 48 at 28 of 56). There is evidence supporting plaintiff's contention that he was the only TPD captain who was directly ordered to march in the MLK Parade, that the directive was made to him as a result of his race, and that he was the only captain who was ever denied a request to take holiday leave time. Other than *ipse dixit* assertions that the foregoing do not amount to "adverse employment actions," the City does not provide any authority or legal analysis supporting any contention that there were no adverse employment actions for purposes of plaintiff's prima facie case. In addition to the alleged disparate treatment in denying plaintiff

holiday leave and ordering him to march in the MLK Parade, the 2010 Performance Evaluation and the transfer to the Fourth Shift may clearly be construed as adverse actions linked to the alleged racially discriminatory directive that plaintiff march because of his race. In this Circuit, "adverse employment action" is "broadly define[d]." *Orr*, 417 F.3d at 1150 (citing *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998)). In general, disparate application of leave policies may constitute an adverse employment action. *See Orr*, 417 F.3d at 1150-51. The Court concludes that the plaintiff has met his burden to establish a prima facie case.

The City argues that it had legitimate, non-discriminatory reasons for ordering plaintiff to participate in the parade, because the parade was a "legitimate community policing event," such events are "important to TPD and the community," and TPD's participation in the MLK Parade "reinforces TPD's commitment to treating each citizen of Tulsa equally, regardless of cultural differences and background." (Doc. 48 at 30).[3]

Plaintiff contends that the City's position is pretextual, because participation in community events is normally voluntary, the TPD Riverside Division Commander did not order any of the captains under her command to participate in the MLK Parade and testified that "participation in the 2010 Martin Luther King Day Parade was voluntary for the supervisors under [her] command in the Riverside Division." (Doc. 57 at 12 of 48 and evidence cited therein). Also, Captain Ford, a white captain under Major Evans, was allowed to take holiday leave during the 2010 MLK Parade, while plaintiff's request for such leave was denied. (*Id.*).

---

[3]     The Tenth Circuit has given weight to TPD's involvement in "community policing" events and noted that such participation represents a legitimate interest in the context of analyzing First Amendment religion claims. *See Fields v. City of Tulsa*, 753 F.3d 1000 (10th Cir. 2014). *Fields* is discussed further below, in connection with plaintiff's First Amendment claims under § 1983. For purposes of evaluating plaintiff's Title VII claim, however, the Court simply accepts that TPD has a legitimate, non-discriminatory reason for participating in events such as the MLK Parade, such that the City has met its burden of production to show such a legitimate, non-discriminatory reason.

Plaintiff also generally points out the inconsistency between an alleged commitment to racial and cultural equality and the different treatment allegedly imposed upon plaintiff because of his race.

The City "denies that [plaintiff] was ordered to participate in the parade due to his race." (Doc. 48 at 29). However, Evans admitted in writing that he had reported to Busby his embarrassment "that few African American officers participate in [TPD] ceremonies, such as ... the MLK Parade..." and acknowledged that "[t]he fact that we both share the same race as Dr. King and that the parade is held in the African American community *is consequential*." (Doc. 57-9, emphasis added). Another captain under Evans's command - a white woman - was permitted to take holiday leave the day of the parade, and the two other captains (both of whom were white) were not ordered to march in the parade. Based upon the evidence, a reasonable juror could infer that the order that plaintiff march in the MLK Parade and denial of holiday leave were, in fact, based upon plaintiff's race.

Under the circumstances, there is evidence, if taken as true and construed in plaintiff's favor, from which a reasonable juror could infer that the order that plaintiff march in the MLK Parade was based upon plaintiff's race, rather than based upon a legitimate non-discriminatory reason. Moreover, deposition testimony of Major Evans, Major Harris, and Chief Jordan established that they were unaware of any other captain ever being denied holiday leave, but plaintiff was denied such leave, notwithstanding that the TPD's "Staff Representation Policy" normally facilitates' captains' ability to take holiday leave when they wish. (Doc. 57 at 10, ¶ 11). The denial of leave facilitated the order that plaintiff march in the MLK Parade and it could be inferred under the circumstances that the denial of leave was imposed singularly upon plaintiff because of his race.

There are genuine disputes of material fact as to whether the City's proffered explanations are pretextual, and the evidence is not "so one-sided that [defendants] must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The City's motion for summary judgment is hence **denied** as to plaintiff's Title VII discrimination claim.

### 2.    Retaliation

The City argues that plaintiff cannot establish a Title VII retaliation claim. (Doc. 48 at 35). Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice...." Although the statute does not refer to such discrimination as "retaliation," the courts have so named claims under § 2000e-3(a). A plaintiff may establish retaliation by presenting direct evidence of discriminatory motivation or, in the absence of direct evidence, a plaintiff must establish a prima facie case under the *McDonnell Douglas* framework. *Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013).

To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action to be materially adverse, and (3) a causal connection existed between the protected activity and the challenged action. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). To establish that causal connection between the protected activity and the adverse employment action, plaintiff must present evidence of circumstances that justify an inference of retaliatory motive. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (citation omitted). "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Id.* The Supreme Court construes the causation requirement as requiring a showing that the employer's desire to retaliate was the but-for cause

of the challenged employment action.  *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2528 (2013).

There is some direct evidence of retaliatory motivation with respect to the plaintiff's 2010 Performance Evaluation.  Plaintiff received his worst performance evaluation shortly following his statement of opposition to being directed to march, and plaintiff's opposition was cited more than once in the evaluation.  Evans gave plaintiff the lowest possible rating of "inadequate" in rating his performance as a supervisor, and directly cited plaintiff's statements in opposition to what plaintiff believed was unlawful race discrimination as a reason for the rating:

> In January of 2010 Captain Busby objected to participating in the Martin Luther King Parade because "he did not want to 'put on a façade of unity' or 'march with them' (referring to officers who opposed the [Black Officers Coalition] lawsuit). When I refused to excuse him from the assignment, he crafted a memorandum that accused me of racism, and implied that legal action would follow if I did not reconsider.

(Doc. 57-19 at 6-8).  Evans did not leave any doubt that he understood plaintiff's opposition was based upon a claim of racial discrimination.  In fact, the foregoing statement in the 2010 evaluation makes it clear that plaintiff's accusation of race discrimination was a reason for the downgrade in his performance.  (*See id.*).  Elsewhere in the evaluation, Evans quoted with emphasis the plaintiff's statement in the January 15, 2010 memorandum that "***the order (to march in the parade is based on me participating because of my race, which is patently illegal....***" (*Id.* at 8, emphasis in original prepared by Evans).  These quotes were provided by Evans as evidencing that plaintiff was "openly defiant" and "insolent, insubordinate, and hostile" during the evaluation period.  (*See id.* at 6, 8).

Even assuming the foregoing would not satisfy the "direct evidence" standard, the Court concludes that the evidence satisfies plaintiff's burden to establish the necessary causation at the prima facie stage under the *McDonnell Douglas* framework.  That is, there is evidence from

which it may reasonably be inferred that, but for Evans's desire to retaliate, plaintiff's evaluation in the supervisor category would not have been rated as "inadequate," and plaintiff would not have been rated as being defiant or insubordinate. In addition, after plaintiff sent a letter to the TPD Chief complaining of retaliation following the MLK Parade, Evans moved him from the day shift to the night shift, 4:00 p.m. to 2:00 a.m., notwithstanding plaintiff's seniority. This evidence presents fact issues for a jury to determine whether these actions would have been taken but for retaliatory motive.

Based solely on the argument that plaintiff has not proved unlawful disparate treatment under Title VII, the City argues that plaintiff did not engage in protected activity. (Doc. 48 at 35). However, in order to show that the employee engaged in protected activity, the employee need not prove that the employer actually violated Title VII. Opposition can be protected even where plaintiff is wrong about whether the employer had actually violated Title VII. Instead, it is enough that the plaintiff had a good faith belief that the conduct he opposed was unlawful under Title VII. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Plaintiff has provided evidence that he believed, and informed his employer that he believed, that Evans's order was "based on my race and as such it is illegal." (*See* Doc. 57-14). Protected opposition is not satisfied only by the filing of formal charges; informal complaints are sufficient to constitute protected opposition. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). The evidence that plaintiff engaged in protected opposition, by voicing complaints and writing memoranda asserting racial discrimination, is sufficient to withstand summary judgment as to the protected opposition element.

The City also argues that plaintiff did not suffer any adverse employment action. Recovery under Title VII's retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," such that a reasonable worker might have been dissuaded from engaging in protected activity. *See id.* at 68. This is so because the retaliation provision aims to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. *Id.* (citation omitted). The standard is stated "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

Construing the summary judgment record in plaintiff's favor, as is required at the summary judgment stage, a reasonable worker would find that the 2010 performance evaluation was materially adverse. Plaintiff presented evidence that, for at least three years after the 2010 evaluation, plaintiff would be prejudiced in applying for promotions, because the evaluation had to be included in such applications, and a reasonable employee might well consider that a materially adverse action. *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 202 (D.D.C. 2011) ("a poor performance evaluation that increases the likelihood of denial of a ... promotion could dissuade a reasonable worker from pursuing charges of discrimination"); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. App'x 424, 433 (6th Cir. 2007) (unpublished) (lower performance evaluations that impact wages or promotion potential may constitute materially adverse actions under *Burlington Northern*).

Plaintiff's transfer to the Fourth Shift, 4:00 p.m. to 2:00 a.m., may also be considered materially adverse, because he has young children at home and the shift assignment resulted in

him spending little time with his family.  (*See* Doc. 57-5 at 13).  One of the situation-dependent examples of material adversity provided in *Burlington Northern* is relevant on the shift transfer: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."  *Burlington Northern*, 548 U.S. at 69.  Plaintiff has also provided evidence that, while planning to transfer the plaintiff to the Fourth Shift, Evans recommended to the TPD Chief that plaintiff not be transferred to another commander, which is circumstantial evidence of retaliatory motive, i.e., that Evans wanted plaintiff to remain under Evans's command so that he could impose the planned transfer to the less favorable shift.   The same evidence cited above also presents a fact issue as to whether the City's explanations for the materially adverse actions are pretextual.

There is evidence from which a reasonable jury could find that materially adverse actions were taken to retaliate against plaintiff for engaging in protected opposition to alleged racial discrimination.  Thus, genuine disputes of fact preclude summary judgment on plaintiff's retaliation claim, and the City's motion for summary judgment is **denied** on that claim.

### B.    Section 1983 Claims

Plaintiff asserts claims under 42 U.S.C. § 1983 based upon alleged violations of his First Amendment rights and rights under the Equal Protection Clause of the Fourteenth Amendment.

### 1.    Equal Protection Claim

Plaintiff's equal protection claim overlaps with his Title VII race discrimination claim. "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under ... § 1983 or Title VII."  *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)).  In addition, for municipal liability under § 1983, the plaintiff must demonstrate that the municipality's

officials acted pursuant to a "custom or policy" of "discriminatory employment practices." *Id.* (quoting *Randle*, 69 F.3d at 446, n. 6, 447).

The City argues that there is no evidence of a custom or policy that led to the alleged discrimination in this case. A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of respondeat superior. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

To establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy distinguishes the "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.'" *Connick*, 131 S. Ct. at 1359.

The Court agrees with the City that there is no evidence of a municipal policy of racial discrimination that caused the alleged harm here. The evidence indicates that Major Evans made the decisions denying plaintiff's request for holiday leave, directing plaintiff to march in the

MLK Parade, downgrading plaintiff's performance evaluation, corresponding with plaintiff, and moving plaintiff to the Fourth Shift. In fact, plaintiff's own submission indicates that other TPD Division Commanders did not require their captains to march in the MLK Parade, undermining any argument that a City policy was responsible for Evans's actions. The evidence also does not support a ratification theory, because there is no evidence that a final decision maker ratified Evans's specific allegedly unconstitutional actions and the bases for such actions. *See Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). "Simply going along with discretionary decisions made by one's subordinates ... is not a delegation to them of the authority to make policy." *Milligan-Hitt v. Bd. of Trustees of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219, 1229 (10th Cir. 2008) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).

TPD Chief Jordan similarly argues that he cannot be held liable in his supervisory capacity under § 1983. Like municipal liability law under § 1983, a supervisor also may not be held liable individually under a theory of respondeat superior. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)). "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999). Three elements are required to establish supervisory liability: (1) personal involvement; (2) causation; and (3) state of mind. *Schneider*, 717 F.3d at 767.

Although federal courts appear to uniformly agree that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) imposes a stricter liability standard for the personal involvement element of a claim for supervisor liability, the Tenth Circuit has not yet determined the contours of that standard. *See, e.g., Booker*, 745 F.3d at 435 (noting the contours of the personal involvement requirement "are still somewhat unclear after *Iqbal* ... [but] [w]e need not

define those contours here....").  But the Tenth Circuit has not overruled its post-*Iqbal* decision

that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates,

promulgates, implements, or in some other way possesses responsibility for the continued

operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which

'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by

the Constitution....'"  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting §

1983).  A plaintiff may therefore establish supervisor liability by showing that "(1) the defendant

promulgated, created, implemented or possessed responsibility for the continued operation of a

policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind

required to establish the alleged constitutional deprivation."  *Id.* at 1199-1200.

Chief Jordan became the Interim Chief of the TPD on January 22, 2010, four days after

the MLK Parade and after the denial of plaintiff's leave request.  There is no evidence that he

had any involvement in those matters.  Even assuming Chief Jordan was involved in denying

plaintiff's subsequent grievances or complaints, in this Circuit, "denial of a grievance, by itself ...

does not establish personal participation under § 1983."  *Gallagher v. Shelton*, 587 F.3d 1063,

1069 (10th Cir. 2009).  There is no evidence supporting supervisory liability upon Chief Jordan.

The summary judgment motion is **granted** as to plaintiff's § 1983 equal protection race

discrimination claim.

### 2.      First Amendment Claims

In his First Amended Complaint, plaintiff alleges that the defendants "forced [him] under

penalty of adverse employment consequences to: (a) conform with an ideology contrary to

Plaintiff's expressed political beliefs in direct violation of [his] right to freedom of speech and

expression; and (b) associate with others contrary to his political beliefs and convictions in

violation of his right to expressive association." (Doc. 7 at ¶ 47). He also claims that he was subjected to retaliation for the exercise of his statements of reasons he did not wish to participate in the MLK Parade. (*Id.* at ¶¶ 50-53).

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("public employees do not surrender all their First Amendment rights by reason of their employment").[4] Thus, the First Amendment protects public employees from adverse employment actions in retaliation for their exercise of free speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). However, government employees "by necessity must accept certain limitations on [their] freedom." *Garcetti*, 547 U.S. at 418.

When analyzing a free speech claim based on retaliation by an employer, the Tenth Circuit applies a five-prong test which has been distilled from *Pickering* and *Garcetti*. *See Couch v. Bd. of Trustees of the Mem'l Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009). The *Garcetti / Pickering* test includes the following inquiries:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Leverington v. City of Colorado Springs*, 643 F.3d 719, 724 (10th Cir. 2011). The first three parts of the *Garcetti / Pickering* test are issues of law for the Court to decide. *Dixon v.*

---

[4]     The First Amendment applies to the states through the Fourteenth Amendment. *Merrifield v. Bd. of County Comm'rs for County of Santa Fe*, 654 F.3d 1073, 1079 (10th Cir. 2011).

*Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). "[A] public employee's speech is unprotected if it was made pursuant to official duties, if it was not on a matter of public concern, or if the balance of interests favors the employer." *Fields v. City of Tulsa*, 753 F.3d 1000, 1014 (10th Cir. 2014).

The defendants argue that summary judgment is appropriate because the plaintiff's objection to marching in the MLK Parade was pursuant to his official duties, the matters on which he spoke were not of public concern, and because the City's interest in promoting unity by participation in community policing events are sufficient to outweigh the plaintiff's rights with respect to his perception of what his marching in the MLK Parade would convey.

Whether plaintiff's objection to marching was a matter of public concern is a question of law. *Leverington*, 643 F.3d at 727 (citing *Baca*, 398 F.3d at 1219). "Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (internal quotation marks omitted); *see also City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "Although speech related to internal personnel disputes ordinarily does not involve public concern, speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials ... clearly concerns matters of public import." *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998). Generally speaking, courts construe public concern "very narrowly." *Flanagan v. Munger*, 890 F.2d 1557, 1563 (10th Cir. 1989).

Plaintiff's objection to marching in the MLK Parade was, in part, that he did not want the TPD to use plaintiff's appearance in the MLK Parade as a signal that "black and white officers were united." (*See* Doc. 57 at 39). Race relations between citizens of Tulsa and its police department or any other governmental entity may certainly implicate matters of public concern. But the gravamen of plaintiff's objection was personal to him: he did not want to march with white TPD officers in the parade, he requested personal holiday leave in an attempt to avoid doing so, and when he was denied leave and ordered to march in the parade, he voiced his objection that his employer was discriminating against him because of his race. His chief complaint was thus related to a personal employment matter, which is ordinarily not considered a matter of public concern. *See Dill*, 155 F.3d at 1202; *see also David v. City & County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) ("speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern."). His appearance in the MLK Parade did not require speech upon matters of public concern, and whether or not he marched did not involve a "subject of legitimate news interest" or of particular concern to the public.

Moreover, plaintiff's objection was not that he disagreed with the purpose or political message of the MLK Parade. Rather, his objection was focused on not wanting to participate in that parade *with other members of the TPD*. While the plaintiff construed the TPD's purpose of participating in the parade as promoting a message that the TPD has resolved all race-related issues, there is no evidence that any such speech was actually or indirectly conveyed by TPD's participation. As noted in *Fields*, and consistent with the record in this case, the TPD participates in numerous community events every year, throughout all segments of the City. *Fields*, 753 F.3d at 1010. To the extent that plaintiff's chief speech complaint is that marching

alongside white members of the TPD amounted to compelled speech, the same "message" or "speech" could be said to be conveyed by an African American officer being assigned to patrol or investigative duty with a white officer. To hold that an officer has a First Amendment right to not be assigned duty alongside or to be seen with a TPD officer of another race (because such assignment would allegedly endorse a false message of racial unity within the TPD) would disrupt the efficient administration of public services and improperly promote an atmosphere of racial division. As in *Fields*, any interest plaintiff has in such a claim is outweighed by TPD's compelling interests in maintaining discipline and maintaining public confidence that police protection will be available to the public impartially. *See* 753 F.3d at 1015.

Plaintiff also claims that his First Amendment rights to freedom of association and from coerced ideological conformity were violated because he was ordered to march in the MLK Parade despite his opposition.[5] The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, religious, and cultural ends." *Fields*, 753 F.3d at 1012 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). That "[f]reedom of association ... plainly presupposes a freedom not to associate." *Id.* (quoting *Roberts*, 468 U.S. at 623). Plaintiff has not complained that he was prevented from engaging in any association. The only association type argument that may be gleaned from his papers is that the directive to march in the MLK Parade forced him to associate and be seen with white TPD officers or TPD officers who had opposed the Black Officers Coalition litigation. The Court declines to find a

---

[5]     The cases cited by plaintiff for the proposition that he was forced into "ideological conformity" are dissimilar to the facts asserted here. One case involved use of union dues of dissenting union members for causes unrelated to the function of the union. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). The others did not involve any issue in the employment context. *See Wooley v. Maynard*, 430 U.S. 705 (1977) (state statute imposing penalty for covering up state motto on car license plate); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (regulation requiring public school children to salute the American flag).

cause of action based upon an alleged freedom not to associate, during work hours, with coworkers of a different race or of different beliefs. To do otherwise would cripple a municipal employer's ability to function effectively in serving the community and in promoting racial unity and equality amongst its employees.

The motion for summary judgment is **granted** as to plaintiff's § 1983 First Amendment claims.

### 3. Qualified Immunity

The individual defendants assert that they are entitled to qualified immunity on plaintiff's § 1983 claims. Having found that plaintiff has not established a First Amendment violation, there is no need to consider whether summary judgment is also necessary based upon qualified immunity. *See, e.g., Allen Oil & Gas, LLC v. Klish,* 113 F. App'x 869, 870 (10th Cir. 2004). In addition, the Court has concluded that Chief Jordan's actions in relation to plaintiff's claims do not satisfy the personal involvement requirement for supervisory liability under § 1983, such that plaintiff's § 1983 claims against him are subject to summary judgment. Nonetheless, the Court notes that the individual defendants would be entitled to qualified immunity, because there was no violation of plaintiff's First Amendment rights, such that the individual defendants were entitled to qualified immunity under the first prong of the qualified immunity test. *See Pearson v. Callahan*, 555 U.S. 223, 232-36 (2009).

The Court also concludes that the individual defendants are entitled to qualified immunity on plaintiff's § 1983 race discrimination claim under the second prong of the qualified immunity test, as the Court has not identified any on point authority as of 2010 that ordering plaintiff to participate in a community policing event during work hours, or denying him holiday leave to avoid participating in such an event, violated clearly established federal rights. Ordinarily, to

satisfy the clearly established prong, there must be a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts establishing that the particular conduct at issue was clearly in violation of federal law. *See Seifert v. Unified Gov't of Wyandotte County / Kan. City*, ___ F.3d __, 2015 WL 846208, *16 (10th Cir. Feb. 27, 2015) (citing *Stewart v. Beach*, 701 F.3d 1322, 1331 (10th Cir. 2012)).

IT IS THEREFORE ORDERED that the defendants' Motion for Summary Judgment (Doc. 48) is **granted in part and denied in part** as set forth above. Because the only claims that remain are plaintiff's claims against the City of Tulsa under Title VII (*see* Doc. 7, First Cause of Action), defendants Charles W. Jordan and Walter Evans are hereby dismissed from this action, with prejudice. A final judgment including that disposition will be entered at the conclusion of the case.

SO ORDERED this 30th day of March, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE