# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

WALTER E. BUSBY, JR.,        )
                                 )
              Plaintiff,    )
                                 )     Case No. 11-CV-447-JED-PJC
v.                              )
                                 )
CITY OF TULSA,           )
                                 )
              Defendant.   )

## OPINION AND ORDER

At the Pretrial Conference in this matter, the plaintiff, Walter E. Busby, Jr., notified the Court that he was only seeking equitable relief on his claims under Title VII of the Civil Rights Act of 1964, and he requested a non-jury trial before the Court.[1] The defendant, City of Tulsa, did not object. The Court accordingly conducted a bench trial at which six witnesses testified: Walter Evans; Chief of Police Charles Jordan; plaintiff Walter E. Busby, Jr.; Paul Fields; Deputy Chief Dennis Larsen; and Karen Ford. The Court admitted into evidence Plaintiff's Exhibits (PX) 2, 5, 6, 11, 12, 13, 14, 15, 18, 24, 25, 26, 32, 37, 38, 45, and 55, Defendant's Exhibits (DX) 23, 25, 27, 33, 35, 39, 41, 42, 43, 44, 45, 46, 47, 48, 91, 92, 93, 94, 95, 96, 97, 98, 116, and 128, and Joint Exhibit 29. Pursuant to Fed. R. Civ. P. 52(a), and upon consideration of the evidence admitted at trial, the Court makes the following findings of fact, by a preponderance of the evidence, and enters the following conclusions of law.

---

[1] Captain Busby's Title VII claims are set forth in the First Cause of Action of his First Amended Complaint. (Doc. 7 at 11-12). The Court previously granted summary judgment on his Second, Third, and Fourth Causes of Action and dismissed individually-named defendants with prejudice. (Doc. 101 at 24).

## I.    Findings of Fact

### Background

The plaintiff, Walter E. Busby, Jr., is an African American man who has been employed by the Tulsa Police Department (TPD) since 1981.  He progressed through several positions over 35 years.  He was promoted to sergeant in 1990 and to lieutenant in 1996.  Later, the lieutenant title was changed to captain, with a change in rank title and duties.  From 1996, Busby requested to work daytime assignments, and he was assigned to the second shift, which is also known as the day shift.  In April 2008, he was transferred to the TPD's Mingo Valley Division, and he was assigned to the day shift.  At the time of Busby's transfer to the Mingo Valley Division, Walter Evans, also an African American officer, was the Major over that division.

Busby and Evans had known each other for years, they were amicable, and they had both been members of the Black Officers' Coalition, which is a fraternal organization of, and support group for, black officers.  In January, 2010, Evans ordered Busby to march in the Martin Luther King, Jr. Day Parade with the TPD group that would be marching.  Busby made it very clear that he did not want to participate.  Ultimately, Evans gave Busby a direct order: "If you are working that day, you will participate and march with the department."  (Tr. at 244:15-22; *see also id.* at 245:17-19; PX 13, 14, 15).  That was the genesis of the disputes at the center of this litigation.

### The Order to Participate in the Parade

Busby claims that the order that he participate with the TPD procession in the parade was based on his race.  The City of Tulsa disputes that Busby was ordered to march based on his race.  Having heard all of the evidence and considered the demeanor and credibility of the witnesses, the Court finds by a preponderance of the evidence that Busby was ordered to march in the parade, and was denied holiday leave in order to force him to march, based on his race.

Busby was the only African American Captain under Evans in the Mingo Valley Division and was the only TPD Captain who was ordered to march in the parade on January 18, 2010. As will be discussed further below, the finding that Busby was ordered to participate based on his race is fully supported by the evidence admitted at trial, including the testimony of Busby and Evans, as well as Evans's own writings at the time immediately before and after the parade.

Busby had long been on the parade citizen organizing committee, and he had at times marched in the parade. He had never marched in the parade as a member of the TPD, and he did not want to march with the TPD in the parade, because he did not think that the TPD had made sufficient progress in areas regarding race relations. (Tr. at 241). On January 13, 2010, Evans called Busby to Evans's office, and Evans indicated that he was "ashamed and embarrassed about the lack of participation of blacks in TPD-sponsored activities, particularly like the parade" and informed Busby that Evans would like to see more participation and would like Busby to participate in the parade. (Tr. 242). Ultimately, Evans more forcefully instructed Busby that, if he was working, he would participate in the parade. (Tr. 243). Busby explained to Evans the reasons he did not want to participate in the parade, which were rebuffed by Evans. Busby then clarified, "Is that an order?" and Evans responded, "Yes, it's an order. If you are working that day, you will participate and march with the department." (Tr. 244). Race was expressly discussed during that meeting. (Tr. 244-245; *see also* PX 18).

On January 14, 2010, Busby requested permission to take leave during the time of the parade. Evans responded, "Just give me a slip," referring to a leave request in writing. (Tr. 47; *see also* Tr. 72-73). Busby turned in a written request. (PX 11). Evans subsequently wrote "DENIED" on the request and then signed it. (Tr. 73). Evans also wrote a memo to Busby, dated January 15, 2010, stating, "After careful consideration, I have decided to deny your

request.  You will report to work on January 18, 2010, as scheduled and one of your assignments for that day will be to participate as a representative of MVD staff at the MLK parade."  (PX 13). After receiving the memo, Busby wrote to Evans indicating that he was "respectfully bringing to [Evans's] attention that [the] order to participate in the parade is illegal [because] [Evans's] stated reason for [Busby's] participation was based on [Busby's] race and as such it is illegal." (PX 14).

The same day, Evans sent a memo to Busby.  (PX 15).  Evans characterized the memo as his "final response" on the issue.  (*Id.*).  Evans disputed Busby's assertion that he was directed to participate in the parade based on his race.  (*Id.*).  However, Evans admitted that he "stated that [he] was embarrassed that few African American officers participate in Department-sponsored ceremonies, such as the Memorial Service, the MLK Parade, and the annual Awards Banquet." (*Id.*).  Evans's memo also stated, "The fact that we both share the same race as Dr. King and that the parade is held in the African American community is consequential."  (*Id.*).  At trial, Evans asserted that the use of "consequential" was a "typo," and that it should have read "coincidental." (Tr. 52-57).  He testified that he knew of the "typo" the day he wrote the memo, but he did nothing to correct the record until after Busby had asserted a claim for racial discrimination.  (Tr. 57).  However, it is clear from the context of the memo exchanges, and Evans's admission that the directive to Busby to march in the parade was made during discussions regarding African American officers' lack of participation in the parade, that Busby's race *was* consequential to Evans's order, rather than "coincidental" to it.

Under protest, Busby complied with the directive and participated in the parade on January 18.  (PX 24; Tr. 250-251).  The next day, Busby reiterated his assertion to Evans that Busby had been treated differently than white Captains and that he believed that Evans's order

was illegally based on Busby's race. (PX 18). On March 30, 2010, Busby wrote to TPD Chief Chuck Jordan, alleging that the work environment had become increasingly hostile to Busby following the parade. (PX 24). Evans provided a memo to Chief Jordan in response to Busby's memo. (PX 25). Evans acknowledged referencing wanting black officers to have higher rates of participation in the parade and other TPD events at the time of ordering Busby to march, but he contended that he "did not assign [Busby] to the parade because he was an African American." (PX 25).

Although other Captains participated in the parade, the evidence at trial supported Busby's assertion that he was the only Captain who was *ordered* to participate. Two Captains volunteered to march in the parade. (*See* PX 15 at 2; PX 25 at 5). One of the four captains under Major Evans's command – who is white – was not ordered to march in the parade and was granted holiday leave, although such leave was denied to Busby when he asked for it. Evans testified that he was unaware of any captain other than Captain Busby being denied holiday leave. (Tr. 71-72; *see also* Tr. 256).

### *Retaliation*

Notwithstanding his participation, soon after the parade, Busby began to encounter adverse consequences, which Busby asserts were retaliation for his complaints about being ordered to participate in the parade based upon his race. Based on the evidence, the Court finds that Evans took actions in retaliation against Busby based upon Busby's protected activity of complaining about racial discrimination.

Evans testified that he took no actions against Busby in retaliation for his opposition to being ordered to march in the parade based on his race or for his complaint of unlawful racial discrimination. However, Captain Busby's complaints of racial discrimination were prominently

identified in the most negative ratings in Major Evans's 2010 evaluation of Busby's performance. For example, Busby was rated as "Need[ing] Improvement" under "Conformance with rules, policies and instructions," and "Relationships with Others," based in part on the following, written by Evans:

> In January of 2010, I assigned Captain Busby to march in the police procession during the Martin Luther King Parade. Captain Busby objected to marching in the procession because (as he stated) he did not want to "stand with them". He so much objected to attending, that I was forced to "order" him to march. He reported to the parade, as directed, but he alienated himself from others by separating himself from others during the assembly, and by marching about 20 feet behind the police procession. This was noticed by other staff in attendance.

(PX 32 at 6-8). Evans also rated Busby as "Inadequate" as a supervisor, based in part on the parade:

> In January of 2010 Captain Busby objected to participating in the Martin Luther King Parade because "he did not want to 'put on a façade of unity' or 'march with them' (referring to officers who opposed the [Black Officers Coalition] lawsuit). When I refused to excuse him from the assignment, he crafted a memorandum that accused me of racism, and implied that legal action would follow if I did not reconsider.

(*Id.*; *see also* PX 24 [Busby's March 30, 2010 memo to Chief Jordan regarding Evans's repeated references to the parade as a basis for denigrating Busby's performance]).[2] Busby requests that the Court order the defendant to purge the 2010 evaluation from his personnel record.

Evidence also points to Evans moving Busby to a different shift in retaliation for Busby's opposition. In February, 2010, Chief Jordan indicated that he would be creating a fourth shift, with hours from 4 p.m. to 12:00 a.m. (Tr. 85-86, 92). At trial, Evans testified that, at the time that Chief Jordan made the announcement in February, Evans decided that he would move Captain Busby from the second shift (the day shift) to the new fourth shift. (Tr. 85-86, 119-120).

---

[2]    Prior to the 2010 parade and the mid-term evaluation that followed shortly after it, Busby had received exceptional evaluations. (Tr. 258-259; *see* PX 2; PX 6).

Upon all of the evidence and the credibility of the witnesses, the Court finds that Evans's decision was in retaliation for Busby's allegations of discrimination. Evans denied that he made that decision out of anger or that he did so to retaliate against Busby. (Tr. 86). However, Evans acknowledged that, at the time he decided to move Busby to fourth shift, Evans felt "hurt and disappointment" because of Busby's claim of racial discrimination:

> Q.  We'll get into your decision making. But when you made the decision to send Captain Busby to fourth shift, you were angry at him for having charged you with racial discrimination in assigning him to march in the Martin Luther King Parade?
>
> A.  Well, if we're labeling emotions, the only emotion that I considered I had was hurt and disappointment, but I was never angry at him at that point.

(*Id.*).

Although Evans made the decision to transfer Busby shortly after the parade, Evans did not inform Busby of that decision until May, 2010. (Tr. 114; *see also generally* PX 26). Busby was later moved to the fourth shift, even though he was the most senior Captain within the entire TPD operations division and had requested to stay on the second shift. (Tr. 115). Busby presented evidence that, notwithstanding the provisions of a collective bargaining agreement indicating captains and above were excluded from seniority preference entitlements (PX 26), there was a practice within the TPD of giving senior captains in the field preference when possible in shift and day assignments. (Tr. 300-301, 366, 369-370, 378-379). Deputy Chief Larsen also testified that the collective bargaining agreement does not prohibit consideration of captains' seniority as to shift and days off, and he does consider captain seniority as one factor in determining assignments. (Tr. 412).

Evans denied the existence of a practice of abiding by the preferences of senior Captains (Tr. 116), and he explained the reasons he chose Captain Ford, instead of Captain Busby, to work on the second shift:

> As you know, this department will again reorganize in August with a Fourth Shift in the Operations Bureau. The Administrative Captain's position will be eliminated, and that position will be assigned to Fourth Shift. My current Administrative Sergeant and Desk Officer will return to Bid Board, so at shift change, I will have an inexperienced Administrative Sergeant, an inexperienced desk officer, and no administrative captain. Also, it is possible that the full-time Equipment Officer's Position will be eliminated as well. Needless to say, there will be a huge void in my administrative operations so I intend to assign some of the administrative functions to the Day Shift commander. I currently have two captains assigned to Day Shift, but only one can remain, and the other has to go to Fourth Shift.
>
> In selecting and assigning personnel under the principle of merit and fitness, I wanted to select an experienced captain for Day Shift that could easily train and coach the new Administrative Sergeant and Desk Officer, oversee some components of our administrative operations, and easily manage the fleet without an equipment officer. Candidly speaking, you are not the best-qualified choice for that assignment at this time.

(PX 26 at 2). Busby responded to the foregoing email from Evans, pointed out certain problems with Evans's explanation, including that Busby had previously served well as Administrative Captain and could obviously perform administrative duties. (*Id.* at 1).

Evans's claim that he "wanted to select an experienced captain for Day Shift that could easily train and coach the new Administrative Sergeant and Desk Officer" made little sense in light of the fact that Busby had previously served as an administrative captain and had the requisite experience. (Tr. 279-280; PX 26 at 1; DX 128). Moreover, Evans's explanation for his selection of Ford to provide Evans administrative help during the day shift was also undermined by the fact that, when Captain Ford became the Day Shift commander in September 2010, she was just over two months from retirement, which was known to Evans at the time. (Tr. 206-207). Even after Ford retired, Evans did not transfer Busby back to the day shift, and the day

shift position was left open. (*Id.*). Finally, although Evans had already made the decision to transfer Busby to the fourth shift later that year when the fourth shift was to be added, Evans wrote to Chief Jordan on March 30, 2010, in response to Busby's complaint of racial discrimination, that Busby should not be transferred to another commander. (PX 25 at 15). This evidenced Evans's intent to keep Busby under his command in order to follow through on his plan to transfer Busby to the fourth shift. All of the foregoing evidence reveals a retaliatory motive by Evans.

Evans later omitted his assertion that Busby lacked the experience for the day shift position. While preparing to explain to the Civil Service Board his decision to transfer Busby to fourth shift, Evans claimed the decision was made because of alleged misconduct by Busby. Of those alleged incidents, two included incidents in 2008 and 2009 that had never been previously documented, and six of the alleged incidents occurred *after* Evans had already decided in February of 2010 to transfer Busby to the fourth shift. (*See* PX 25 at 27, 28). Evans's shifting explanations were a pretext for his retaliatory actions against Captain Busby.

At the time of the change to fourth shift, Busby's two daughters were young and in school. The shift change was a hardship on him and his family, because he was working during evenings, from around the time they would get home from school until after bed time. He would not often see his daughters during the week, and he missed cheerleading performances and birthdays. (Tr. 282-283). In addition, Busby and his family often attended Friday night football games, and he was unable to do that without taking leave from work on the fourth shift. As a result of the shift change, in order to try to spend any time with his family during the week, he was forced to use substantial amounts of his accrued vacation time, which he had spent years accumulating.

Busby testified that the move to fourth shift required him to completely change the manner in which he utilized his leave time. There were three types of TPD leave: acquired vacation; compensatory time; and sick time accrual. (Tr. 292-293). He was at the top level of accrual, and each month, he accrued 17.33 hours of acquired vacation and 8 hours of sick leave. (Tr. 293). The maximum amount of sick time that was permitted to be accrued was 1200 hours. Once an officer reached 1200 hours of sick time, additional sick time each month would be converted into acquired vacation time, until the acquired vacation cap (416 hours) was reached. (Tr. 293-294). When the acquired vacation time cap was also reached, then the officer would have to "use or lose" any leave time above the caps. (*Id.*). Acquired vacation time is valuable, as a retiring officer may take, or be paid for, accumulated acquired vacation leave. (Tr. 294). In addition, at retirement, all accumulated sick leave hours above 960 hours could either be converted to acquired vacation leave (unless the 416-hour cap had been reached) or be put into a health savings account. (Tr. 294-295). When an officer would reach 960 hours, he could convert all sick time above that, hour for hour, into vacation time. (*Id.*).

At the time that Busby was transferred to fourth shift, he had reached the 1200-hour sick leave cap, which meant that he was accruing acquired vacation time of 25.33 hours, instead of the normal 17.33 hours, each month. (Tr. 294). Because he had also reached the maximum 416 hours of acquired vacation leave at the time of the transfer to fourth shift, every month, he had been acquiring a total of 25.33 hours of vacation which he had to "use or lose." (Tr. 295). After he was transferred to fourth shift, he had to dip into his accrued accounts of acquired vacation and sick leave in order to spend time with his family. (Tr. 295-297). As a result, Busby has requested that the Court order that his banks of vacation and sick leave be reinstated or, if that is not possible because he has reached the cap(s), he be awarded cash value for the hours he

utilized to mitigate the damage from the retaliatory shift change. (Tr. 296). In other words, he has requested to be reimbursed all of the time that he took off during the 26 months that he was on the fourth shift. (*See* Tr. 301-302). At the time he left fourth shift, he had only 27 hours left of his 416 hours of acquired leave time. (Tr. 297). Busby testified that he also converted 64 hours of sick time to acquired vacation during the 26 months he was on fourth shift. (Tr. 297-298). During the 26 months he was on fourth shift, he used 389 of his 416 acquired vacation hours on top of the 25.33 hours of vacation time he was acquiring and using every month.

## II.   Conclusions of Law

### A.   Disparate Treatment Claim

Title VII of the Civil Rights Act makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). A plaintiff proves a Title VII violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Under the burden-shifting framework, a plaintiff must establish that he (1) is a member of a protected class, (2) suffered an adverse employment action, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). If plaintiff establishes that prima facie burden, then the defendant

must offer a legitimate, non-discriminatory reason for the employment action. *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (citing *Horizon/CMS Healthcare*, 220 F.3d at 1191). Assuming the employer meets that burden, the plaintiff may then prevail only by proving that "the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

"Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). Thus, if "a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' [the trier of fact] may 'infer the ultimate fact of discrimination' or retaliation." *Smothers*, 740 F.3d at 546 (quoting *Swackhammer v. Spring/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)). Plaintiff bears the ultimate burden to prove his discrimination claim.

There is no dispute regarding the first element of Busby's disparate treatment claim. As an African American, Captain Busby is a member of a protected class.

With respect to the second element of the disparate treatment claim, Busby asserts that being directed to march in the parade and being denied requested holiday leave were adverse employment actions taken because of his race. The evidence established that Busby's race was a motivating factor in the directive to march in the parade and the related denial of holiday leave. That evidence included the following: (1) Evans's own statements that he was "ashamed and embarrassed about the lack of participation of blacks in TPD-sponsored activities, particularly like the parade," and he would like to see more participation and would like Busby to participate

in the parade; (2) Busby was the only Captain who was *ordered* to participate in the parade; (3) another Captain – who is white – was granted requested holiday leave for the day of the parade, while Busby's request was denied; (4) Evans's January 15, 2010 memo to Busby, admitting that he had "stated that [he] was embarrassed that few African American officers participate in Department-sponsored ceremonies, such as the Memorial Service, the parade, and the annual Awards Banquet"; and (5) Evans's statement that "The fact that we both share the same race as Dr. King and that the parade is held in the African American community is consequential." The foregoing facts certainly give rise to an inference of discrimination based on Busby's race, so as to satisfy the *McDonnell-Douglas* analysis.

Although the Court finds that two of the three elements of Busby's Title VII disparate treatment claim have been met, that claim fails because marching in the parade and being denied a few hours of holiday leave time, which meant that he had to march in the parade while he was on duty, are not "adverse employment actions" within the meaning of Title VII jurisprudence. The discrimination provisions of Title VII are limited to adverse actions "that affect employment or alter the conditions of the workplace." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)). Claims of adverse employment action on the basis of race are considered on a case-by-case basis, "examining the unique factors relevant to the situation at hand." *Id.* (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)). "Adverse employment action includes 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" but does not include "'a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004); *Sanchez*, 164 F.3d at

532).   In this Circuit, "adverse employment action" is "broadly define[d]."   *Orr v. City of Albuquerque*, 417 F.3d 1144, 1150 (10th Cir. 2005) (citing *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998)).

Considering the evidence in this case, the Court finds and concludes that being ordered to march in the parade, and being denied leave for two hours to avoid marching in that parade, did not constitute a *significant change* in Captain Busby's employment status, benefits, or the conditions of his employment. At most, those actions were a mere inconvenience or alteration of his job responsibilities – for less than a day.   Moreover, the evidence reflected that Busby gave high fives and acted festively amongst the crowd of parade watchers, and he had marched in the parade before, albeit not in his capacity as an officer of the TPD.   TPD engages in community policing events as part of its effort to engage with the citizens of Tulsa as a "partnership in policing," and officers are assigned to participate to fulfill that function.   (*See* Tr. 219, 251). Captain Busby did not introduce evidence that he suffered any damages, nor did he request an award of damages, for his disparate treatment claim.   While disparate application of leave policies may constitute an adverse employment action, *see Orr*, 417 F.3d at 1150-51, the denial of a few hours of requested holiday leave did not constitute a significant change or anything more than a mere inconvenience in this case.[3]

---

[3]      This determination is limited to the specific facts of this case.   It is repugnant that TPD orders of any kind would be based upon an officer's race.   However, the determination of this claim is dictated under the applicable law, which requires a significant change in terms or conditions of employment.   Depending on the circumstances of a particular case, ongoing orders to participate in community events or any other specific duties – when based on an officer's race – may well constitute a significant change or alteration in terms of employment.   That is just not the situation here, which involved a one-time occurrence to participate in a community policing event and a denial of a request for two hours of leave time.

Accordingly, the Court finds and concludes that Busby is not entitled to judgment on his claim for disparate treatment race discrimination (Part A of his First Cause of Action in the Amended Complaint, Doc. 7).

## B.    Retaliation

Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice. . . ."  Although the statute does not refer to such discrimination as "retaliation," the courts have so named claims under § 2000e-3(a).  A plaintiff suing for retaliation "must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011)). The plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to [the plaintiff's] interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'" *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224-25 (10th Cir. 2008)); *accord Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013).

To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action to be materially adverse, and (3) a causal connection existed between the protected activity and the challenged action. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  In the absence of direct evidence of retaliatory motive, the plaintiff may establish that causal connection between the protected activity and the adverse

employment action through evidence justifying an inference of retaliatory motive. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (citation omitted). The Supreme Court construes the causation requirement as requiring a showing that the employer's desire to retaliate was the but-for cause of the challenged employment action. *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2528 (2013).

### 1.    The 2010 Evaluation

Busby asserts that the negative aspects of the 2010 performance evaluation were in retaliation for engaging in protected activity. In order to show that he engaged in protected activity, an employee need not prove that the employer actually violated Title VII. Opposition can be protected even where plaintiff is wrong about whether the employer had actually violated Title VII. It is enough that the plaintiff had a good faith belief that the conduct he opposed was unlawful under Title VII. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984); *Winters v. Bd. Of Cty. Comm'rs of Muskogee Cty.*, 633 F. App'x 684, 688 (10th Cir. 2015) (unpublished). Busby provided evidence that he believed in good faith, and informed his employer that he believed, that Evans's order was unlawful discrimination based on race:

> [T]his document serves as my respectfully bringing to your attention that your order to participate in the parade is illegal. Your stated reason for my participation was based on my race and as such it is illegal. It is also unfair as I am unaware of any other Captain, on-duty or otherwise who has been ordered to participate in this parade.

(PX 14; *see also* PX 18).[4]

---

[4]    The Court has found by a preponderance of the evidence that Busby's race was a motivating factor in Evans's directive to march in the parade. The same evidence upon which that finding was made establishes that Busby had a reasonable, good faith belief that he was engaging in protected opposition to unlawful discrimination under Title VII.

Protected opposition is not satisfied only by the filing of formal charges; informal complaints are sufficient to constitute protected opposition. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). The evidence here established that Busby engaged in protected opposition, by voicing complaints and writing memoranda to Evans and Jordan, asserting racial discrimination.

The Court also determines that a reasonable employee would have found the 2010 performance evaluation to be materially adverse. Recovery under Title VII's retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern*, 548 U.S. at 64. Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," such that a reasonable worker might have been dissuaded from engaging in protected activity. *See id.* at 68. The standard is stated "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

The negative components of the 2010 evaluation satisfy the foregoing standard. The evaluation was the worst that Captain Busby had received in over 30 years on the TPD, and it included serious critiques that Busby had "been openly defiant about some assignments and directives given to him by his chain of command," that he had "often been insolent, insubordinate and hostile," and that he "carefully crafted" memoranda "to offend the target reader." (PX 32 at 6-8). Evans concluded the evaluation by stating that Busby must "show[ ] marked improvements in the above deficiencies, [be] willing to demonstrate more flexibility, mutual respect, and acceptance of other viewpoints," and that Evans "would not recommend a division command for him." (*Id.* at 13). Captain Busby testified that he had considered applying

for a position with the United States Marshal Service and that, with such a position or any other law enforcement position, the negative comments in his prior evaluation might prevent him from such employment. (Tr. 291-292).

With respect to the third element – a causal connection between the protected activity and the challenged action – the Court determines that Evans's desire to retaliate was the but-for cause of the negative performance ratings given in the 2010 evaluation. The performance evaluation – the worst Busby had ever received – followed shortly after his opposition to being directed to march based on his race, and Busby's opposition was cited more than once in the evaluation. Evans gave Busby the lowest possible rating of "inadequate" in rating his performance as a supervisor, and directly cited Busby's statements in opposition to what Busby believed was unlawful race discrimination as a reason for the rating:

> In January of 2010 Captain Busby objected to participating in the Martin Luther King Parade because "he did not want to 'put on a façade of unity' or 'march with them' (referring to officers who opposed the [Black Officers Coalition] lawsuit). When I refused to excuse him from the assignment, he crafted a memorandum that accused me of racism, and implied that legal action would follow if I did not reconsider.

(PX 32 at 8). Evans did not leave any doubt that he understood Busby's opposition was based upon a claim of racial discrimination. In fact, the foregoing statement in the 2010 evaluation makes it clear that Busby's accusation of race discrimination was a reason for the downgrade in his performance. (*See id.*).

Elsewhere in the evaluation, Evans quoted with emphasis Busby's statement in the January 15, 2010 memorandum that "***the order to march in the parade is based on me participating because of my race, which is patently illegal. . . .***" (*Id.* at 8, emphasis in original prepared by Evans). These quotes were provided by Evans as evidencing that Busby was "openly defiant" and "insolent, insubordinate, and hostile" during the evaluation period. (*See id.*

at 6, 8). By a preponderance of the evidence, the Court determines that retaliation was the but-for cause of the negative aspects of the performance evaluation. Evans's reliance on Busby's complaints of race discrimination for his findings that Busby was "defiant" and "insubordinate," amongst other negative findings, are direct evidence of retaliatory motivation. Even assuming they are not direct evidence of retaliatory motive, TPD's assertions that the negative findings in the evaluation were made for legitimate, non-retaliatory reasons are not supported by the evidence at trial, and Evans's attempted explanations are pretextual.

Captain Busby is accordingly entitled to a judgment in his favor on his retaliation claim as to the 2010 Performance Evaluation. He requests that the Court direct that the City of Tulsa "purge" that evaluation from Busby's employment record, and Busby has cited cases that support such relief. (*See* Doc. 144 and authorities cited therein). The Court determines that he is entitled to that relief.

### 2. *Shift Change*

The reassignment of Captain Busby to the fourth shift was also motivated by his protected opposition to what he believed, in good faith, was race discrimination. The decision to transfer him to the fourth shift was made soon after the parade. (*See* Tr. 85-86). At the time he made that decision, Evans was "hurt and disappointed" because of Busby's allegation of race discrimination. (Tr. 86). Although Evans made the decision soon after the parade, he did not inform Busby of that decision until months later. At the time the transfer was completed, Busby had engaged in additional protected activity by writing to Chief Jordan alleging discrimination and retaliation. (*See* PX 24).

Busby's transfer to the fourth shift, 4:00 p.m. to 12:00 a.m., was also materially adverse under the applicable standards, because he had young children at home, and the shift assignment

resulted in him spending little time with his family. As the Court found above, the evidence established that the shift change was a hardship on him and his family, and he was forced to use substantial amounts of his accrued vacation time, which he had spent years accumulating, in order to maintain some semblance of a family life. One of the situation-dependent examples of material adversity in *Burlington Northern* is relevant to the Court's determination that a reasonable employee would find the shift change materially adverse: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington Northern*, 548 U.S. at 69.

Based on the evidence at trial, the Court concludes that retaliation was the but-for cause of Captain Busby's transfer to the fourth shift. While planning to transfer Busby to the fourth shift, Evans recommended to the TPD Chief that Busby not be transferred to another commander, which is circumstantial evidence of retaliatory motive, i.e., that Evans wanted Busby to remain under his command so that he could impose his plan to transfer Busby to the less favorable shift. Evans made the determination that he would move Busby to the fourth shift soon after the parade, and his numerous attempts to explain why he selected Captain Ford for the second shift were not credible, as noted in the Court's findings above. Evans's explanation for his selection of Ford to provide daytime administrative help was nonsensical in light of the fact that, when Captain Ford became the day shift captain in September 2010, she was just over two months from retirement and, after she retired, Evans left the day shift open. That evidence undermines Evans's assertion that he moved Busby to fourth shift because of Evans's acute needs for administrative help during the day shift. As noted in the Court's findings, Evans also provided shifting justifications for his decision to move Busby to fourth shift. The same evidence establishes that Evans's alleged reasons for moving Busby to day shift were pretextual.

Accordingly, Busby is entitled to judgment on his claim of retaliation regarding the shift change. Captain Busby requests that the Court order that the City of Tulsa restore a total of 1,047 hours of vacation leave and 64 hours of sick leave to his leave accounts or, to the extent any hours cannot be restored because they would result in exceeding the applicable leave caps, order that Busby be paid the cash value of any such hours. The evidence does not support an award of all of the 1,111 hours of leave time that Busby took during the 26 months he was on the fourth shift. Busby testified that, at the time he was assigned to the fourth shift, his accounts of sick leave and acquired vacation time were full, i.e., he had reached the caps. Even *before* he was moved to the fourth shift, Busby was using those 25.33 hours of "use it or lose it" acquired vacation time each month, such that he could not have been injured by continuing his use of those 25.33 hours of leave for the 26 months that followed. Thus, there was no difference in how he used those 25.33 hours that he accrued each month after he was moved to fourth shift, and to compensate him for those hours would result in a windfall to Captain Busby. *After* the shift change, he was using those 25.33 hours, *plus* he took an additional 389 hours of acquired vacation and converted 64 hours of sick leave to acquired vacation time. He will be made "whole" by an order directing the City of Tulsa to restore to him the 389 acquired vacation hours and 64 hours of sick leave that he utilized from his capped leave accounts as a result of the retaliatory transfer to fourth shift.

### III. Order for Relief

1. The City of Tulsa shall permanently remove Captain Walter E. Busby's 2010 evaluation from his personnel file and shall destroy all copies of said document, including but not limited to all paper copies and versions maintained electronically. The City of Tulsa shall be prohibited from using the 2010 evaluation or any part thereof in any manner or for any reason.

2.    The City of Tulsa shall compensate Captain Busby for the 389 acquired vacation hours and 64 hours of sick leave that he utilized from his capped acquired vacation and sick leave accounts as a result of the retaliatory transfer to fourth shift.  Specifically, the City of Tulsa shall restore 389 hours of acquired vacation and 64 hours of sick leave to Busby's respective leave accounts.  If some or all of the leave hours to be restored cannot be credited to his leave accounts for any reason, such as the hours to be restored would exceed the sick leave and/or acquired vacation account caps, the City of Tulsa shall pay Busby the cash value of any of those hours that cannot be credited to his account.  In the event the parties cannot agree to the cash value of any hours that cannot be credited, the Court shall be advised within 30 days of the date of this Order, and the matter will be determined by the Court.  The Court will await the entry of Judgment until being so advised.

3.    Captain Busby is the prevailing party in this action, and the Court, in its discretion, determines that he should be awarded a reasonable attorney fee as part of his recoverable costs.  His motion for attorney fees and costs shall be filed within 20 days of the date of this order.

SO ORDERED this 25th day of January, 2018.


JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE